We will hear argument first this morning in Case 12-123, Horne v. Department of Agriculture. Mr. McConnell. Mr. Chief Justice, and may it please the Court, there is a surprising number of difficult merits questions lurking in this case, mostly involving whether there was a taking, and if so, how it should be conceptualized and valued. Could I just stop you on a factual matter, because it has confused me. As I look at the captions of the cases, there appear to be two different partnerships. One partnership, known as Raisin, doing business as Raisin Valley Farms, has Mr. Horne and his wife as the partners. Larson Valley, the producer, not the producer, the handler, has four other, the Hornes plus two other people. So who owns the Raisins? Isn't that the first partnership of the husband and wife? And isn't the handler a second partnership that does the business of handling? The other two partners and Larson were Laura Horne's parents, now deceased. But the estates have been substituted. That's right. So isn't it two legal entities, one who owns and one who handles? One partnership produces, one partnership handles? The Department of Agriculture did not distinguish among them. Well, I don't care if they did or they didn't. I mean, we should know. Are they two separate legal entities? They are separate. They are separate legal entities, all effectively controlled by the same family. Well, that's, you know, in the cap, you get some limited liability by creating separate entities. So the creature who owns is one partnership and the entity that produces, that handles, is a separate one. I assume this is one of those difficult merits questions you were alluding to. It doesn't go to whether there's jurisdiction, but to whether the claim of a taking can be asserted by the partnership in question, doesn't it? That's right, Justice Scalia. I don't see how it goes to jurisdiction, which is the only question before us. Well, it does to my mind, because what is the claim, assuming that the producer owns, the producer entity owns the raisins, what exactly is being taken from the handlers? Is it the percentage? It can't be the raisins because they don't own them. Well, Justice Sotomayor, I'm delighted to preview our argument on the merit on that. What do they own? What is it that's being taken from the handler entity? The order in this case was issued against the horns in their capacity as a handler only, so the entire fine was paid by them. None of the fine is attributable to anyone in their capacity as a producer. All right. So go back. What is the – what was taken from them? You're saying it's just the fine? The fine is it taking? Or what was the interest that they're claiming was taken by the government? They didn't own the raisins, so they get paid a fee for handling. So this is our position, Justice Sotomayor. I think we have to look at what is it that the Department of Agriculture attempted to take. So in the demand letter from the Department of Agriculture addressed to the horns, they asked the horns to deliver California raisins or the dollar equivalent. So that's the fact upon which all of this case is built. Now, what is the legal significance of that, California raisins or the dollar equivalent? It is our legal position, or it will be our legal position on the merits, that when the government seeks a specific physical property, a reese, or its monetary equivalent, that that is a taking of the reese itself. And there's support for that in the precedent from this Court. The closest case is Village of Norwood v. Baker. In this case, the city condemned a strip of land for the purpose of building a road. They tried to get out of paying any compensation by claiming that the abutting landowner would gain value. That was rejected. They were assessed a $2,000 compensation for the taking. And then the city turned around and issued a special assessment against the landowner for precisely that $2,000. The landowner came back up to this Court and this Court held that it was a taking, a taking of the land. And in a subsequent case just a couple of years later, the Court described this as a, quote, ''actual confiscation of private property to public use. '' Kennedy, but you began by saying that these are merits defenses, but you wanted to focus first on the jurisdictional question that's before us. That's right. I hope it helps to inform the jurisdictional question. But the jurisdictional question is this. The Ninth Circuit held that my clients could not even raise their takings claim on the merits until they had first gone to the court of claims. I think there are three things wrong with that. Ginsburg. Am I right in thinking that there is no dispute on that point, that the takings claim could have been asserted by the Horns as producers in the court of Federal claims? I think that the government no longer disputes, although you should ask them to be clear. I think that they no longer dispute that this is not a jurisdictional point, even though they prevailed after the petition for rehearing was filed in the court of appeals. On the ground that it was jurisdictional. Ginsburg. If they are jurisdictional or not, as a practical matter, producers who are not subject to fine as handlers, but the producers of the raisins whose raisins are being segregated, could they go to the court of Federal claims and say, my raisins have been taken? Whether the claim is being brought in the capacity of producer or handler, I think is not relevant to one of our arguments, and it is relevant to the other argument. But I just want a straight answer to that question. You are representing producers, and they just produce. No, no, no. We are representing people who are both producers and handlers. No, I said hypothetically, hypothetically. Is the court of Federal claims the proper forum for a producer? It depends upon whether the taking has been from them or not. In the ordinary case, the ordinary relationship between a producer and a handler, the producer is not paid for the reserve raisins, and therefore, any payment that would come, any lawsuit on behalf of those raisins, would go to the producer, and that would go, I think, to the court of claims. In this case, though, the business model is quite different from that. And the producers in this case were paid everything. They received full market value for their raisins. The only people who are out any money in this case are the horns in their capacity as handler. So that's why they are the only ones who are entitled to that money. Sotomayor, meaning they had to pay it over to the producer. The producer was going to pay them a handling fee, but that money didn't belong to them. It belonged to the producers who supplied them with the raisins and expected payment for them. If they were sold in the ordinary course. I'm not sure which money you're – they have not asserted any claim on any money. The producers have been completely paid off. It is the handlers who have been held responsible. And the reason they were held responsible was the following logic. And you see this on page 78 of the judicial officer's opinion. They were held responsible because in their processing capacity, when they were doing the stemming, the seeding, the fumigating, the packing, that this was regarded by the Department of Agriculture as possession, physical possession of the raisins and acquisition of the raisins, even though they never had title to the raisins. It's the Department of Agriculture that has attached to them a possessory interest in the raisins and then assessed them the full monetary equivalent of those raisins, its full market value, $484,000, for the market value, because it's – because under this very unusual regulatory scheme, the government regards them as having possessed the raisins, even though that is not a – Kagan Mr. McConnell, I'm sorry. Could I, along the lines of what Justice Ginsburg was saying, suppose that the Horns had given over all the raisins, right, but that they thought that this was improper, that this marketing order was a violation of the Takings Clause, could they have gone to the court of claims via the Tucker Act and said, we want our money back? They gave over the raisins. The question – they say we're entitled to compensation. Could they have gone through the court of claims? Jay If they had not been paid for the raisins, they had taken raisins to a handler, received no money for them, I think that they could go to the court of claims. Kagan In other words, the Horns did what the marketing order suggested they should do. They gave over the raisins, but they said this is just improper. You're saying they could go to the court of claims? Jay Yes. Kagan Okay. So if that's the case, I guess then the question is, why didn't they have to go that route? Jay They didn't – they didn't go that route, and the question, I think, is what are the legal consequences of that? Kagan Right. Jay Because what they knew was that they were not going to be compensated for the raisins, and therefore they came up with a plan, a business plan that they believed made – eliminated any handler and made it unnecessary for any of the independent producers on whose behalf they're operating to turn over raisins to the government. The plan was ultimately rejected, and we haven't brought a cert petition on it, but the plan actually complies with the language of the regulation, because they believe that in their capacity as handler, as processor, that they never acquired the raisins. Acquisition is the key term for becoming a handler under the rule, and they believe that since they were simply providing a service for $12 a ton to their neighbors, that they never acquired the raisins, they never possessed the raisins, and therefore no one had to comply with the regulation. Scalia Some of the raisins were their own. At least as to that, that wouldn't be true, right? Jay That's correct. I think that's correct. Kennedy Well, to get you back to the jurisdictional point, let's just assume a hypothetical case where a regulated entity has to pay an exaction which it deems to be a penalty, and let's assume it can go to the court of claims, but it doesn't. It waits until the penalty is assessed, and then when the penalty is assessed, it says this is a taking. That — is that the case that you want to discuss with us today? Jay That's right. When the underlying order would be a taking, and they have been assessed money because they didn't comply with the taking, we believe they can challenge that as a taking. And both under the AMAA procedures, in which are exclusive, I think that they have to go through the Department of Agriculture and then to the district court. But I also think under the principles of the — announced by this Court in the Apfel decision, that they are entitled to a remedy in the district court. Ginsburg Mr. McDonnell, would you explain the — if they were just handlers who weren't producing any raisins, if they were just handlers, do they have a claim and where? And if they were just producers, I take it from the question I asked and the question Justice Kagan asked, that if they were just producers, the raisins got set aside, they were paid for, only the ones that went to market, they could go to the court of claims. But now they're just handlers, as this entity is for most of the raisins that are involved, some 80 percent, right? It's only about 20 percent is their own. So could this work for someone who is just a handler, doesn't produce any raisins? So if they are just a handler, as the Department of Agriculture treated them, as far as the Department of Agriculture is concerned, they are only a handler. They are required to raise the — exhaust their claims before the Department of Agriculture and then challenge the order in the district court. But I'm trying to understand is this scheme, apparently it wasn't enough just to be a handler or just to be a producer. The claim that you're making turns on the coincidence of being both a producer and a handler. I don't think that that's so. I think that we — that the horns ought to prevail on either — in either of their capacities. So any handler, any handler could be making the same claim? Any handler who has a business model that is similar to this. But most handlers — What do you mean by what's the business model that's similar to this? So most handlers, if they are in compliance with the order, they take all the raisins from the producers. They only pay for the free pool raisins. They don't pay for the reserve raisins. And they never have any interest in the reserve raisins. And in this case, the horns did not operate that way. The producers receive full value for all of their raisins. So the producers are not in the case. They have no standing. They have no pocketbook injury. The entire pocketbook injury in this case is borne by the horns in their capacity  Sotomayor, in response to you. Sotomayor, I'm sorry. In the normal model, the handlers buy or buy the free raisins and then pay the producers? Is that what it is? That's correct. And, oh, so that's the difference in this model. They don't take title to the raisins, is what you're saying. Exactly. And the horns believed that this would mean that they were not handlers. All right. Let me — And they were found to be handlers anyway. What is the value in permitting a party who doesn't own property to raise a taking claim on behalf of other people? Meaning, doesn't the system have an interest in ensuring that people comply with their legal obligations? And to the extent that you choose to violate the law the way they have here, that the fine is punitive and not compensatory, meaning you don't own the raisins, but you were obligated to put raisins aside for someone else, you were their agent, and you failed to meet a government obligation that was independently on you. So I go back to my question. What was the taking, since you didn't own the raisins? The taking is the fine, is what you want to call the taking. The taking is what the government demanded, which is either give me your house or give me your money, give me your raisins, or give us the monetary equivalent. They're not your raisins. By the time — by the time this order was enforced, the raisins were gone, and so as a practical matter, only one of those two alternatives was what was the matter of time. Oh, but in answer to Justice Ginsburg's question, that you said the producers could go to the Court of Federal Claims to contest the taking of the — producers could go to contest the taking of raisins. If they had not been paid for the raisins. If they had not been paid for it. But are you — does that mean you do not think that the AMAA withdraws Tucker Act jurisdiction? It withdraws Tucker Act jurisdiction only for handlers. So if we're talking about pure producers, pure producers do not go to the — don't have to go through the AMAA process. Why? Why does it withdraw it for the one and not the other? These New Deal-era programs, Justice Scalia, are somewhat — the purpose is somewhat obscure. I don't mean the policy reason. What in the law leads you to that conclusion? Oh, well, this is straightforwardly set forth in the — in the — in sections 14a and 15a of the AMAA. I don't think that's in dispute. So only producers are regulated by this program. Only producers have a right to go through their remedies in the Department of Agriculture. Only producers have to do that. It's a — it's completely a producer. I'm sorry. I'm sorry. Excuse me. Each of those was — please substitute the word handler for each of those. It's only the handlers that are regulated under this — under this program. So — and my clients were treated as handlers. They believed that they were not. But it is the Department of Agriculture that has attached this — this status to them. And it's a — it's, I think, quite a catch-22 for the government to come along and say, although we are fining you $700,000 in your capacity as a handler, you're not a handler for purposes of challenging the legality of that order. I'm just trying to get to what you're arguing about, and I might be off base by now. I feel like handlers, purchasers, raisins, I'm like an old abbot in the stele. I just want to see that I'm — that I'm right. Tell me. Just say you're wrong, and I don't go into it further. But there are some people, they've been — they have some raisins, all right? And these particular people whom the department has said have acquired the raisins. It said they acquired the raisins. And so there are some raisins. And then the government says, do this thing with your raisins, and they don't want to do it. So they don't. So they don't do it, even though the law says do it. And then they say the law is unconstitutional. And moreover, you fined us a huge amount of money, and we don't want to pay it because the law is unconstitutional. And we consider that money that we paid, call it a fine, call it what you want. We consider we shouldn't have paid it, and now we want it back and we want compensation and we think it's a taking, and where do we go? Can't we make that argument in the Ninth Circuit? It's something like that, isn't that what we're arguing? Almost exactly right, but not quite. With one detail difference is that this is the proceeding here that decides whether they have to pay. They have not yet paid the fine. Breyer, so we shouldn't have to pay because this is all unconstitutional, and now what's your argument? So they're raising a defense. It isn't that they are getting fined. I got that. And then the Ninth Circuit says go to the court of claims. And you say, no, we don't have to go to the court of claims. But that detail actually is quite important, because remember, you can't even go to the court of claims unless you are seeking damages for an actual violation that has already taken place. We could not go to the court of the warrants, could not go to the court of claims right now. What the government says is that they should pay the $700,000 fine first and then go to the court of claims to get it back. And that is exactly what this Court said in Apfel, is a, quote, ''pointless set of activities that Congress could not possibly have contemplated.'' I think that's true, Mr. McConnell, as to part of the fine, that part of the fine falls under Apfel, but not the other part. As to the compensation part, it seems to me you have a pretty decent Apfel argument. But as to the penalty part, I don't really understand how the Apfel argument would go. It seems to me that as to the penalty part, the key thing is that if they had handed over the raisins, they could have gone to the court of Federal claims and had the compensation done there. And the fact that the government is penalizing them for not complying with the marketing order does not fall within the rationale of Apfel. Well, the most pertinent case for that part of the fine, for the penalty part, is Missouri Pacific Railroad v. Nebraska. So this is a case where the railroad was told by the State to do some expensive work. Railroad says, no, that would be a taking if we were required to do that. There is no compensation available, and so they don't do it. They are fined $500. That gets up to this Court, and in an opinion by Mr. Justice Holmes, the Court holds that that is a taking and that the railroad is entitled to challenge the taking in the form of the fine. So for the penalty portion, the punishment portion of the fine, Missouri Pacific Railroad is actually the more pertinent decision, which comes back. I don't think I fully answered all the variants of Justice Sotomayor's question. Breyer, what I'm trying to do is to get you on the basic argument, which you started with, which is why is there why was the Ninth Circuit wrong when they said they had no jurisdiction to hear this, that rather they had to go or you had to go to the  There are three reasons. One is it has nothing to do with jurisdiction. Second, the Tucker Act does not apply to cases where there is a defense being lodged to a monetary exaction. That's APFEL as supplemented by Missouri Pacific Railroad. And third, even if that were not so, the AMAA displaces the Tucker Act, and they were required to exhaust their remedies before the Department of Agriculture and take their case to the district court in which they reside. Scalia What was the first? I forgot the first already. What was the first? The first is that it isn't jurisdictional. And therefore, it could not have been raised to the Supreme Court. What is jurisdictional? The requirement to go to the court of claims when you need to is not jurisdictional, that that's a matter of remedy. That is, it's the equitable principle that you may not pursue your case for an injunctive relief when there is inadequate and a remedy involved. Sotomayor Mr. McConnell, if the producers had decided to challenge this as a Tucker Act violation, they would have had to hand over the raisins? Or could they have just held on to the raisins and said, I'm not handing it over until I get just compensation? McConnell So had they held on to their own raisins and sold them, I assume? You don't not just let them rot. If they had sold them, then the Department of Agriculture would have called them a handler, because anyone who sells raisins is called a handler, and then they would be fined in their capacity as a handler, and it would be a somewhat similar case to this one. Sotomayor All right. McConnell Maybe an easier one than this one. Sotomayor Well, the point is that under a normal takings claim, you have to hand  over the raisins and pay it back to you, correct? McConnell Not necessarily correct. There are a whole string of cases in which property owners raise takings as a defense. Rather than turning over the property, Kaiser-Retina is perhaps the most best-known recent case, but out of an administrative context, there is the Florida Power and Light case. Penn Central was like this. Loretto v. Teleprompter is like this. There is a whole string of cases. The government themselves cite six such cases, most of them fairly old, for this proposition. So there is nothing unusual about bringing a defensive takings claim. Ms. Ginsburg Mr. McConnell, I don't want to encroach on your rebuttal time, but one mysterious thing. The first time around, the Ninth Circuit decided this case on the merits. So if you are right, I take it, we remand and then they adjudicate the merits of the takings claim, but they already did that. McConnell Yes, Justice Ginsburg, and they did that on a ground that we think is manifestly inconsistent with this Court's precedents. We were prepared to we were trying to get it on bonk review and we were prepared to come to this Court from the merits determination. We were blocked from that because the government, after the petition for rehearing was filed, came up with calling this a jurisdictional argument, raised this objection for the first time, and the Ninth Circuit panel accepted their view, issued a new opinion stripping out the entire merits and substituting this jurisdictional holding that is producing so much enjoyment for us this morning. May I reserve the remaining time? Thank you. Roberts Thank you, Mr. McConnell. Mr. Palmore. Palmore Thank you, Mr. Chief Justice, and may it please the Court. I would like to start where Justice Sotomayor started with Petitioner's counsel, because any takings analysis needs to begin with a careful identification of what property was allegedly taken. Petitioners in this case have actually advanced two different theories about what property of theirs was taken, what taking is at issue here, raisins and money. We think both takings claims fail for threshold reasons, but they are different threshold reasons that call for different analysis. Kagan Mr. Palmore, before you do that then, have you conceded the point that this is not jurisdictional? Palmore We agree that the failure to go to the court of claims is not properly viewed as a jurisdictional defect. We did invoke Ninth Circuit precedent below stating that it was jurisdictional, and some of this case's, this Court's cases put it in ripeness terms, which is an Article  So there has been some view that this is not jurisdictional. Roberts When did you first raise the argument that it was jurisdictional? Palmore In our opposition to the rehearing petition. Roberts And now you're changing back again and saying it's not. Palmore There was Ninth Circuit precedent holding that it was jurisdictional, and we relied on that. And there's certainly language for it. Roberts You relied on that when you got to rehearing. You didn't rely on that before you went before the Ninth Circuit, right? Palmore That's correct. We think this is properly viewed as a substantive defect in the claim. So in a sense, the Ninth Circuit in its initial panel decision ruled for the government on kind of substantive defect one, there's no taking. And what it did on rehearing, in our view, although it attached the wrong label to it, it substantively was correct in concluding that there was substantive  Kagan But, Mr. Palmore, if you're conceding now that this is not jurisdictional, it seems to me that your Tucker Act argument as a substantive argument, I mean, has been waived. You didn't raise that argument until the rehearing petition. Palmore That would certainly be something that the Ninth Circuit could consider in the event there were a remand here. But the Ninth Circuit did decide it. The substance of its bottom-line conclusion was correct, and all of its analysis was correct. It simply used the wrong word. So we think it is here. And moreover, Scalia I'm really confused. You're saying there ought to be a remand here, because the question is not jurisdictional, which is just what your friend says, right? Palmore While the Ninth Circuit didn't Scalia But the two of you are in agreement. It ought to go back to the Ninth Circuit. They should do it on the merits, and if that's wrong, we can review that. Palmore Look, if that happens, of course, as Justice Ginsburg pointed out, the consequence for us is they reinstate the prior panel opinion. Scalia Well, that may well be, but we'll see. Palmore So I'm not going to resist too strenuously that kind of remand. But they did decide it, and moreover, they decided something separate, which is at JA 305 they said something different, which is the kind of threshold defect in the takings claim turning on raisins, which is there's a capacity problem. So there are two problems with a raisin claim, a capacity problem and a just compensation problem. The capacity problem is this. In 2002, after having been strictly raisin producers since 1969, entering into a market where there was a reserve requirement from the beginning, they knew what they were getting into, they decided to adopt a new business model, as Petitioner's counsel says, but as was found below, they adopted a business model that was an intentional, willful attempt to evade regulatory requirements in order to secure an unfair competitive advantage. But what they did was they took on the obligations of a handler. They became raisin handlers in 2002, and what came with that status were a series of regulatory obligations that apply only to handlers and under the AMAA can apply only to handlers. The requirement to have raisins inspected, the requirement to file truthful reports, the requirement to make records available, and the requirement to separate out raisins into what's called free tonnage and reserve tonnage. Any raisins processed, it doesn't matter who owns them. Those are handler-specific regulatory obligations that were imposed upon them, and they violated every single one of them willfully and intentionally in order to secure an unfair competitive advantage. And what the USDA did was impose penalties on them for the violation of law that attached to them only as raisin handlers, and then they invoked the judicial review proceedings in Section 14 that provides a judicial review mechanism only for handlers. Scalia, but part of that penalty was, you know, your raisins or your life, right? I mean, it was you don't have to pay the penalty if you give us the raisins. That's not correct, Justice Scalia. They have to give the raisins. Mr. McConnell referred to demand limits. I mean, they have to give the raisins? They are under a regulatory obligation to provide the raisins. If they violate that regulatory obligation, they are subject to sanctions. One component of the penalty is not a choice, and I think that's very important to point out. There were actually two different demand letters. Mr. McConnell referred to a demand letter saying your raisins or your money. There was an initial demand letter saying you are a handler, you have to comply, we're going to come get the raisins. The second demand letter said, we showed up, literally it says, we showed up with our truck, you didn't provide the raisins, so now you've got to provide the cash equivalent, and there were also going to be, as there were, separate regulatory proceedings brought against them for violating those obligations, not just the failure to reserve, but all these handler-specific obligations. They filed false reports, they didn't make raisins available for inspection. There were a whole host of regulatory violations that were at issue here, and when they invoked the handler review action in the district court, they could assert defenses as a handler, but, for instance, another producer, producers can't invoke these judicial review schemes, another producer couldn't have intervened in that action to assert its producer. Alitoso, as this case stands, as it comes before us, is there a claim that they, that money, the government is trying to take money from them without just compensation? That was certainly not how we understood the claim to be litigated below. That's not how the Ninth Circuit thought, understood the claim. We've been talking about the claim involving the raisins, which fails for the capacity reason and the just compensation reason. Alitoso, is that an issue we should decide or is that an issue that the Ninth Circuit should decide, whether there is a takings claim for money? That was certainly not decided below, so a remand, to the extent that this was preserved, a remand would be possible outcome there. We think, though, that that claim suffers from separate, separate procedural defects. Alitoso, if we assume for the sake of argument that there is such a claim, why does that not fall within APFEL? Well, we think that, for several reasons. First of all, the APFEL opinion that's referred to was just a plurality. It's not been adopted by the Court. Second of all, the APFEL analysis relied on this one-for-one, dollar-for-dollar concept. That was a critical part of the plurality's discussion there. And it thought that it would be simply a pointless exercise for Eastern Enterprises to be required to pay the premium and then to go to the Court of Federal Claims and get the exact same amount of money back. We've suggested that there are a whole host of reasons. Alitoso, before you leave that, don't they claim that the entire amount that is assessed against them is a taking? Now, maybe they're wrong, that the entire amount assessed against them is a taking without just compensation. Maybe they're wrong, but isn't that a merits question? That's — they are clearly wrong about that. And I — but I think however you characterize that defect, it defeats this dollar-for-dollar, pointless exercise point that APFEL put out. But why is that a necessary part of APFEL? Why didn't APFEL just mean when we're dealing with cash, you don't have to go to the Court of Claims? So even, you know, you can have a discussion in the district court about whether it's not dollar-for-dollar and it should be discounted in some way. But why should the fact that it's dollar-for-dollar mean — why is that a requirement as opposed to just it's cash? And so the question of, like, you know, handing some over — handing it all over and getting some back, that can be done in the district court rather than making somebody file a separate suit. Well, I think there were two things going on in APFEL, and there were really two distinct reasons why the plurality in APFEL thought that there was no requirement to go to the Tucker Act there. One was that it thought that in a statute like that, that simply allocated benefits and burdens among private entities, Congress would not have intended there to be compensation available in the event that there were a taking. And that was actually the government's position in that case, and the APFEL plurality cited to that portion of the government's brief. And it cited cases in its discussion that weren't dollar-for-dollar or even cash-transfer cases in which the court had gone to the merits-of-takings claims without consideration of a Tucker Act remedy. Then there's the second idea, which is the cash-transfer idea. And we think that the dollar-for-dollar aspect of that was important to the plurality's analysis because it viewed that as evidence that Congress would not have intended the Tucker Act to be deployed because it would have been a pointless exercise. So it really went to what Congress's intent was. Here, of course, for myriad reasons, that dollar-for-dollar analysis breaks down. Breyer, but there's a similar – I mean, it seemed to me, again, simplifying, that underlying this, their clients think this whole raisin program is unconstitutional. What it does is it takes raisins that we grow, in effect throws them in the river, and in the 30s that was done to raise raisin prices. And they think as a matter of policy, that just hurts people by raising prices. And as a matter of constitutional law, it takes raisins from some people that belong to them and uses them for this bad purpose. Okay. That's their view of it. Something like that, isn't it? Yes. Fine. So they're making that kind of constitutional claim. Now, I would think if all you told me was that, and I knew nothing about all these statutes, I would say that's the kind of claim that should be made in a Federal district court, period, not the court of claims, because their government isn't going to compensate them for anything. That's against the whole point of the program. Either this program is valid or it isn't. And if it isn't, some authoritative set of courts should tell us that. So I have a feeling this is somehow not a right fit with the court of claims. Now, you explain to me why that purely instinctive feeling at this point is completely wrong. Sure. Justice Breyer, we've now shifted back to the first theory about the property, which is the raisins. What they could have done in 2002, they had been a producer of raisins, solely a producer of raisins, for decades. At any point during the 19 — between 1969 and 2002, they could have gone to the court of claims and said, this reserve requirement is a taking of my raisins, I want my just compensation. That is not just a remedy, as Mr. McConnell suggests. It is a constitutional condition on the taking of private property for public use. As long as there's just compensation, there simply is no violation. So that's why what we're saying is that's not what the statute meant. I think that's what Justice Breyer says. Did Congress create a statute in which we're going to take your raisins and then you can go to the court of claims and get your money back? I mean, that surely is not what Congress contemplated. The whole notion of the program is you can't get your money back in the court of claims. Now, if you're raising a constitutional objection, that's something else. That should be done in district court. But to say that Congress contemplated, you know, we'll take your raisins and then you sue in the court of claims, we'll give you your money back, that's a weird statute. Justice Scalia, two responses to that. First of all, these claims have been litigated in the court of claims. The Evans case, the Cal-Allman case, both of which we cite in our brief. Raisin producers, or in the Cal-Allman case it was an almond producer, went to the court of claims and said this reserve requirement is a taking, I want my money. And they lost the court of claims correctly, in our view, held that there was no taking. That said, we do agree that it is actually a close question whether Congress would have intended compensation to be provided in a situation like this one in the event the raisin reserve program were found to be a taking. We've said in our brief we do view that as a close question, although on balance we think that the proper answer is that there is a remedy or, sorry, there is a just compensation available in the court of claims. But there are cases such as this. Scalia, you think that's a close question? You think the way the statute is supposed to operate, once it is held that this is an unconstitutional taking, is that every year the government takes the raisins and every year the grower goes to the court of claims and gets the money back for the raisins. Is that the program that Congress anticipated? Well, we do agree that it's a close question for the reason you argued. I don't think it's close at all. That's a crazy statute. Every year we're going to take raisins and every year we're going to pay you in the court of claims. What's the purpose of that? Well, of course, Congress didn't think this was a taking. And it's and it built considerable administrative flexibility into the statute. And at the end of the day, that's what convinces us that Congress would not have intended to preclude compensation in the court of claims and to opt for an injunction instead, because the Secretary of Agriculture has wide latitude to adjust. So compensation wouldn't be paid year after year, as your hypothetical suggested. The program could be adjusted. A reserve requirement is only one way of complying with the kind of supply control provisions of the statute. There are any number of options available. But I'd also point out that in this Court's precedence in Monsanto and regional rail, those were both statutory schemes which had their own compensation mechanism, as does this one, this reserve raisins. The producers do get paid sometimes for them in a smaller amount. Those were cases in which the statutes did have compensation mechanisms, and this Court held that the Tucker Act was available as a kind of a supplementary compensation in the event that the State had a surplus. Ginsburg-Miller No, am I incorrect in thinking that the government is saying handlers cannot raise the constitutionality of the raisin marketing order? You told us that the producers can go to the court of claims. What about the handlers? They're at least being fined for violating the Act, and it's their position that the whole thing is unconstitutional. Can they raise the constitutionality of the whole arrangement defensively, or they simply can't raise the constitutionality of the Act? Justice Ginsburg, I think this goes back again to the property question. If the claim is that it's unconstitutional because it takes producers' property, they can't raise that in this proceeding. If the property is the raisins, they can't raise that in this proceeding. They need to comply and go to the court of claims for compensation, which means there has been no – in the event there's a taking, it's a constitutional taking because just compensation is provided. If the claim is that the money that was taken from me, the fine, that itself is a taking, then we think that claim can and must be brought in the context of the AMAA proceeding. That was not how the court of appeals understood the claim here to be, and there's no precedent for the idea that a fine for violation of law can be articulated as a taking of the lawbreaker's property without just compensation. I haven't seen any case that stands for that proposition, and that would be quite remarkable. Kennedy, the Ninth Circuit didn't understand that. Kennedy, the Ninth Circuit didn't understand that. And I thought that what we were going to decide was whether or not, assuming you can go to the court of claims, you must go to the court of claims, can you prefer to wait, have a penalty assessed against you, and say this is unconstitutional and it's a taking. Your position is you can't say that. I don't understand why. Other than if you want to talk about Williamson and so forth, I can get into that. Justice Kennedy, the Ninth Circuit didn't understand a taking claim to be that the fine for my violation of law is a taking of my money. That's not how the Ninth Circuit understood the claim, so they didn't analyze it in that way. They understood the claim to be that the taking of producers' raisins is a taking, and we lawfully resisted it because it was an unconstitutional taking. The Ninth Circuit correctly rejected that because there was nothing unconstitutional about it because it was not without just compensation. The Tucker Act is the just compensation. This Court has held since it's not just the just compensation. I take it in the program is supposed to come from the fact that raisin prices go up. So the poor children with their noses pressed to the glass because they can't pay the raisins, their parents are the ones who are paying the compensation. And certainly not the taxpayer. He's not going to pay, and maybe the other producers will pay, some will get gypped or something. I don't know, but I can't believe that Congress wanted the taxpayers to pay for a program that's going to mean they have to pay higher prices as consumers. What, Justice Breyer, and that goes to the merits of it? No, no, no, it doesn't go to the merits. It goes to whether or not it makes sense to think that the court of claims has something to say about this. And suppose we did this. Suppose we said, given the fact that you filed your thing, whatever it was, you know, late in the end, in the light of this very enlightening discussion, which has been helpful, we think this is the kind of program and challenge to the program where there isn't going to be a remedy really in the court of claims and they ought to go ahead in the Ninth Circuit, and in light of all these enlightening things that we'll write, you just decide the merits. Is that now why? I'm sure you're going to say that's absolutely terrible, it won't work at all. So tell me why not. Well, Your Honor, of course, the consequence of that is they reinstate our prior victory in the prior panel opinion. No, no, we'd say, well, given the way that we've talked about the program, perhaps it's best to consider this matter fully. Well, they did consider the matter fully. In the initial opinion, they said there's no taking here. So all of the discussion we're having here is about – is predicated on the idea that if there were a taking, would compensation be available in the court of claims. Sotomayor, we agree there's no taking. Sotomayor, it almost seems to me, and I'll ask Mr. McConnell when he gets up at rebuttal, that there is some sort of due process challenge going on here that's been created by the labels they did in this new business venture. In the normal situation, the handler, I'm being told, would actually have a title to the raisins, and they would pay the producers for the raisins. So there would be property taking. In that situation, where the handlers actually own the property, would they be able to raise a taking defense? No, because of the way that the statute and the regulatory program works. If the handler is actually buying raisins from the producer, the handler never takes title to the reserve raisins, and he doesn't pay for the reserve raisins. He takes title to the free tonnage raisins, and the title to the reserve raisins passes as a matter of law from the producer to the Raisin Administrative Committee. The handler never owns those raisins. Sotomayor, so they are missing a business opportunity because they can't take title to those raisins. And yet you're asking them to pay. They would never pay for those raisins because they can't take title, they can't lawfully take title to those raisins. Sotomayor, this really does sound to me, and I think that both Justice Scalia and Breyer now are being more and more convinced, there has to be a place to challenge the scheme. Whether it's a taking, whether there's a takings claim for the handler, because the handler is being asked to do things. But the handler's property is not being taken, and that's critical. There are separate takings claims that handlers have advanced that could be asserted through this process. For instance, there was a case called Lion Raisins from the Federal Circuit that we cite in our brief, in which the issue was that the handler provided bins to store the raisins, and he didn't get his bins back. Okay? That was a handler taking claim, and that had to be asserted in the context of this handler review scheme. But the handler doesn't own the raisins under this scheme. Scalia, I think it goes to the scope, the capacity question that we were talking about before, because the statute is quite clear in Section 608C.13b that this scheme does not regulate producers in their capacity as producers.  So the regulatory obligations that apply to Petitioners when they adopted this business model were handler-only regulatory obligations, and then this is a handler judicial review proceeding. It's a very narrow means of decision here that avoids some of these kind of conceptual questions about the nature of the takings clause, which is that this claim simply doesn't belong in this proceeding. But there's no unfairness or no due process issue here at all, because this is a process that is not subject to any kind of regulatory obligation. So they, in 2002, when Petitioners decided to engage in this, these regulatory violations in order to secure an unfair advantage over their competitors, as was found by the ALJ at JA41, at that point they could have sought compensation for the past 6 years of raisins that they had provided. They didn't do it. I don't understand why they didn't do it. They left that claim on the table. And to the extent they wanted to claim going forward, they could have continued to use compliant handlers and sued every month for compensation in the court of claims. Alitoso, did I understand you to say a couple of minutes ago that if the case were remanded, you would be entitled to win on the reasoning of the panel opinion? The prior panel opinion, Justice. If there was a remand on the basis that the Ninth Circuit misunderstood this as a jurisdictional Article III defect and then the Ninth Circuit were to find waiver, what the Ninth Circuit presumably would do would be to reinstate its first panel decision, which we think was also correct and held that there was no taking here. They're true. Kagan. What would be wrong, would anything be wrong, with a disposition of this Court that went something like this? Everybody agrees that this is not a jurisdictional issue, including the government, so they got that wrong. Now, as to this whole business about the Tucker Act and whether the Tucker Act provides a remedy, the government only started talking about that in a petition for rehearing en banc, and the government can't do that. You know, it can't introduce an argument like this in a petition for rehearing en banc, so that's waived. And now the Ninth Circuit can go and try to figure out whether this marketing order is a taking or is just the world's most outdated law. That would certainly be an available option, or the Ninth Circuit could decide for itself whether there had been a waiver. But there's a separate issue, and there's this capacity issue, which is a separate point that the Ninth Circuit made at JA305 when it pointed out that this was a producer claim, and that's something that was strictly a producer claim and wasn't a fit for this handler review action, and that's something that could also be considered on remand. But the consequence of this, of that, would be for the court to impose its – if it found a waiver to rule for us for separate merits reasons. We do view the Tucker Act, the failure to seek just compensation, as a merits defect in the Petitioner's claim here. So even putting this capacity problem aside, there's simply – there's no defense. Mr. McConnell says that this can be raised as a defense, but there is no defense if all you show is that there has been a taking of private property for public use, full stop. Breyer, there is some opinion here which says these handlers acquired the raisins. Now, what's that about? Acquire is a defined term, and it includes to possess. So they possess raisins. So they're just like lessees or something, baileys? There was no question under the regulatory scheme here that Petitioners were handlers. And in fact, there's a surprising degree of— No, no, I just wanted to know what the word acquirer meant. Acquirer is defined to include a number of things, including to possess. And a handler is anyone who sells raisins. There was no mystery about this. And in fact, at pages 8 through 11 of our brief, we cite communication after communication where USDA told them— Breyer, can an acquirer of my car, for example, I don't know, forget that. Bailey. I mean, can they assert a takings claim that attaches to the car? It sounds like a standing question. I suppose a bailey could, a bailey of the car. I don't think a bailey could. I think the owner would have to assert that claim. Right. But acquire is a defined term. And as this case comes to this Court, it's accepted. The Petitioner has not sought cert on the underlying regulatory findings. In fact, their arguments, they were told ahead of time that they were completely wrong over and over and over again, and then they lost that claim at every level, twice within the Department of Agriculture, in the District Court, in the Court of Appeals, they lost on that regulatory claim. This wasn't a good faith misunderstanding. If you look at JA-41, the ALJ found that this was a willful and intentional knowing violation of regulatory requirements because they were able to undercut their competitors by not playing by the rules. So this doesn't present any kind of due process. Breyer. They think this program is unconstitutional because it takes some other people's property, all right? So those other people are in a very special relation to them. Those other people are really close, and it may be they have standing to assert those other people's claims. And if they do have standing to assert those other people's claims, why can't they make the argument that way? I disagree that they have standing to make those other people's claims, and also Petitioners haven't argued, haven't made any third-party standing argument here. But this Court's requirements are quite strict for third-party standing. You have to have a close, close relationship, and I don't think a mere arm's-length commercial relationship would count. Suppose they do have standing, could they raise the claim? If you say no. Well, they certainly have standing as producers to raise the claim. Let's assume they have standing. Could they raise the claim? That this is an unconstitutional taking? In the court of claims, absolutely, as producers. No, no. In the administrative proceeding where they are charged with the penalties being assessed against them. I think that they would have standing, but it's still a claim that's beyond the scope of this narrow, specific judicial review proceeding. I think it's a different problem. I have to say, I think it comes with less than good grace for you to criticize the other side for not having raised a particular argument. But I do want to clarify that you have no objection at this point for reversing the Ninth Circuit on the ground that they erred in saying that this they should have dismissed on jurisdictional grounds. Well, I'm not going to resist that too strenuously, but I think they did decide the question. They decided it correctly. It was a threshold defect. Their analysis was all correct. So I think that's before the Court. But, yes, we frankly acknowledge and we acknowledged in our brief that we did not we did suggest below that this was a jurisdictional defect. Ninth Circuit authorities said that it was, and we relied on that. We now believe that it's best understood not as a jurisdictional defect, but as a substantive defect in the claims, not simply a choice of remedies issue, as Petitioner suggested. Because choice of remedies suggests that there's been a constitutional wrong, and then we need to decide what remedy is going to be available and its function or damages. Sotomayor, the short answer is, yes, reach the merits only if I win. That's really what you want us to do. Well, we think you can reach some of the merits. We think that the narrow disposition here is actually the capacity. No, no. I need to ask you this question, because do you want us to reach the merits if we're going to have you lose? You've got to want one or the other. Do you want us to reach the merits, period, is really the question. Yes, our position is that we've not, we're not acquiescing in a remand. We think you can affirm and you should affirm. However, I do recognize. Do you think we should reach the merits, which is a very different question? Well, it depends on what you mean by merits, okay? Only if you win, right? There's the under, there's the taking, no, there's the underlying kind of takings claim that there was, was there a taking here at all, and that's not before the Court. I don't think anyone suggests that that's before the Court. But we do, we do think that there are a series of other threshold defects in the claim that this Court could, could rely on. Thank you, Mr. Palmore. Mr. McConnell, you have three minutes remaining. I'd like to make two quick points. One is that I believe that the government has essentially conceded here in this argument and in their brief that the Tucker Act does not apply. They have told us that the Tucker Act does not apply on page 50 and repeated here, when Congress could not have contemplated a compensation. Now, in addition, and their only answer to that is to say, first, that Congress didn't think it would be a taking, which in regional rail this Court said is not the question, and secondly, that if, if there's one, we should get paid once, compensation once, and then the administrator is going to cancel the program, which is no answer at all. Either the statute contemplates compensation for everybody or it contemplates it for nobody. I think they have effectively conceded that the Tucker Act does not apply. Well, they've conceded that it doesn't apply to handlers. To handlers. And in my opinion, the second issue I wanted to talk about is this capacity issue. Certainly we have standing. It's not third-party standing. All of the money comes out of our pocket. Yes, we have standing. And secondly, we certainly have — and that is in our capacity as handler. Essentially, the Department of Agriculture's view is that during those couple of days when the raisins are going through our packing plant, that we acquired them and possessed them during those couple of days, and that we should have given them their, their share. That's raisins, that's not money, but by the time they get around to enforcing that and so forth, the raisins are gone, and now the money stands in, stands in for the raisins. But that is a taking claim. We think it's a straightforward taking claim under, under Norwood and, and Missouri Pacific Railroad. That's a merits question. But in any event, it is not a problem of capacity. Whatever might be that taking, that taking is in the capacity as a handler. Those are my two points. Thank you. Thank you, Counsel. The case is submitted.